

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

RCH:RWN/SMS
F. #2025R00028

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 11, 2025

<u>By ECF</u>

The Honorable Robert M. Levy
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Rashad Ruhani
     <u>Criminal Docket No. 25-182 (RPK)</u>

Dear Judge Levy:

   The government respectfully submits this letter to supplement its two prior detention memoranda, attached hereto as Exhibits 1 and 2, and to set forth additional facts in support of the defendant's continued pre-trial detention. The government has obtained additional evidence relating to the defendant's concealment of his cell phone from law enforcement, as initially described in Exhibit 2. In addition, the defendant has repeatedly violated the conditions of his confinement at the MDC, and the government's ongoing investigation has found that the total value of the defendant's fraud is larger than previously known.

   I. <u>Background</u>

   The defendant is charged by indictment in the above-referenced case with one count of wire fraud conspiracy in violation of 18 U.S.C. § 1349, three counts of wire fraud in violation of 18 U.S.C. § 1343, one count of theft concerning a program receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(A), and one count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h) (the "Indictment"). <u>See</u> ECF No. 1. Generally speaking, the defendant and his co-defendant conspired to defraud the non-profit organization at which they worked (the "Organization") of tens of thousands of dollars. <u>See</u> <u>id.</u>

   The defendant was arrested on the evening of June 10, 2025, and an arraignment was held the following day before the Honorable Vera M. Scanlon, United States Magistrate Judge. Given his serious criminal history, including a sentence of imprisonment for 25 years to life for his third violent felony conviction; his repeated violations of probation and failures to appear in court; and the fact that his wife is based in Saudi Arabia, the government sought detention. <u>See</u> Exhibit 1 at 5-6. Defense counsel did not propose a bail package at the time and

consented to detention until he could present a bail application. Judge Scanlon found that the defendant was a danger to the community and entered an order of detention. See ECF No. 7.

Thereafter, the defendant made an application for bail, and a bail hearing was held on June 25, 2025. At that hearing, the government argued for continued detention based both on the grounds initially set forth, as well as the defendant's repeated parole violations. Notably, the defendant was on lifetime New York State parole when he committed the instant offenses, and remains on parole to this day. Besides the commission of the instant offenses, the defendant has consistently violated the conditions of his New York State parole, including by residing at an unapproved address and repeatedly leaving the state without permission. As detailed in the government's supplemental detention memorandum, the defendant lied about his residence to his parole officers for at least six months while residing at a luxury penthouse apartment in Astoria, Queens (referred to in the Indictment and Exhibit 1 as the "Penthouse Apartment"), which was paid for by the Organization based on fraudulent reimbursement requests. See Exhibit 2 at 2. The defendant also traveled outside of New York State without receiving permission or notifying his parole officer on at least a dozen occasions, and on many of these trips he used the Organization's credit cards to fund a lavish lifestyle. See Exhibit 2 at 2-3. In short, since his release from prison in 2022, the defendant has repeatedly disregarded the conditions of his New York State parole, continuing the pattern of violating conditions of release reflected in his criminal history.

As the government further detailed in its supplemental detention memorandum, the defendant also misled Pretrial Services about: his assets, hiding a BMW that he has still not admitted to owning; his residence, claiming he would reside at the Penthouse Apartment that is leased by his co-defendant; and his occupation, claiming he would work at a company operated by his wife (referred to as Individual-3 in the government's prior detention memoranda), who is also a subject of the investigation based on her no-show job at the Organization.[1] See Exhibit 2 at 3-4. There is thus every reason to believe that the defendant will not comply with the conditions of pre-trial release in the instant matter as well. After hearing argument, the Honorable Cheryl L. Pollak denied the defendant's application for bail with leave to renew.

As noted in the government's prior memorandum, the defendant also cannot be trusted to comply with any conditions of release because he has already taken steps to obstruct the investigation of this case by discarding his cell phones before they could be seized, after he was contacted by another subject. The government has continued to investigate the defendant's obstruction, which appears to have continued even from within the Metropolitan Detention Center ("MDC").

---

[1] At the June 25, 2025, bail hearing, the defendant's counsel represented that the defendant was estranged from this wife. However, records provided by the Metropolitan Detention Center after the bail hearing show that the defendant has sent and received multiple emails with his wife since his arrest.

II.    The Defendant's Efforts to Obstruct the Investigation

On June 6, 2025, the defendant and another individual ("Individual-1") traveled together from John F. Kennedy International Airport ("JFK") in Queens, New York, to Los Angeles International Airport ("LAX") in California.  The defendant and Individual-1 had a return flight scheduled for June 10, 2025.  Cell-site location information from a judicially authorized search warrant (the "CSLI Warrant") showed that a device associated with the defendant (the "DEVICE") was in the vicinity of Los Angeles between June 6, 2025, and June 10, 2025, consistent with the DEVICE being in the defendant's possession.  Records from JetBlue showed that the defendant and Individual-1 were traveling together on the same reservation.

On or about June 10, 2025, the defendant and Individual-1 returned together on a JetBlue flight from LAX to JFK (the "Subject Flight").  The Subject Flight departed from LAX at approximately 4:30 p.m. EDT and was scheduled to arrive at JFK at approximately 11:30 p.m. EDT.  Location information from the CSLI Warrant showed that the DEVICE was in the vicinity of LAX immediately prior to the Subject Flight's departure, again consistent with the DEVICE being in the defendant's possession.  In addition, surveillance photographs taken by law enforcement at LAX prior to the departure of the Subject Flight showed the defendant and Individual-1 together, and also showed that the defendant possessed a cellular telephone, which appears to be the DEVICE, at that time, including the following photograph in which a cellular telephone is within a red box (Individual-1 has been redacted):



After the Subject Flight departed from LAX, law enforcement officers executed judicially authorized search warrants and searched several subjects of the investigation in order to seize electronic devices in their possession, custody, and control.  One of the subjects from whom a device was seized was Individual-2, an associate of the defendant.  At approximately

6:19 p.m., after Individual-2's device was seized and while the Subject Flight was en route to JFK, the defendant received a phone call on the DEVICE from a phone number associated with Individual-2, and the two had a phone call for approximately one minute. Subsequently, at approximately 7:09 p.m., the DEVICE called a cellular telephone associated with another one of the subjects from whom a device was seized ("Individual-3"), and the two had a phone call for approximately five minutes and 22 seconds.[2]

Once the Subject Flight landed at JFK, data from the CSLI Warrant showed that the DEVICE was powered on and located in the vicinity of JFK. Data from the CSLI Warrant showed that the DEVICE then ceased emitting location information, indicating that it had been powered off.

Shortly thereafter, the defendant exited the Subject Flight alone while Individual-1 remained on the aircraft. Individual-1 did not exit the Subject Flight with the defendant even though the two were sitting in adjoining seats and were traveling together. Upon exiting the Subject Flight, the defendant was taken into custody and searched by law enforcement agents. The search revealed that the defendant no longer possessed the DEVICE or any other electronic device, though he did possess two iPhone chargers.

After determining that the defendant did not possess any electronic devices, law enforcement agents began looking for Individual-1 at JFK. Prior to exiting the airport, Individual-1 was confronted by a Special Agent with the Federal Bureau of Investigation ("FBI") (the "FBI Agent"), who identified himself to her as such. During this encounter, Individual-1 lied to the FBI Agent. Specifically, Individual-1 told the FBI Agent that she was not traveling with anyone else. Individual-1 also stated that all of the electronic devices in her possession were her own devices. Individual-1 then exited JFK.

The government's ongoing investigation of the defendant's efforts to obstruct justice has revealed that, while subsequently incarcerated at the MDC, the defendant engaged in numerous phone calls with Individual-1 at a phone number that he registered in Individual-1's name as required under MDC policy ("PHONE-1"). The calls were recorded per MDC rules, and a review of the calls makes it apparent that Individual-1 did in fact have the defendant's DEVICE, and was actively using the DEVICE at the defendant's direction.

For example, on June 12, 2025, at approximately 1:02 p.m., the defendant engaged in a recorded MDC telephone call with Individual-1 at PHONE-1. During the call, the defendant asked, in sum and substance, for Individual-1 to contact an individual ("Individual-4") on the defendant's behalf. The defendant told Individual-1 to "go to the phone that you have" to look up the phone number for Individual-4. In other words, the defendant was directing Individual-1 to look up Individual-4's phone number on the defendant's DEVICE, which was in Individual-1's possession. On or about June 12, 2025, at approximately 5:29 p.m., Individual-1 engaged in another recorded telephone call with the defendant at the MDC via PHONE-1.

---

[2]    JetBlue offers free unlimited WiFi to customers while they are in-flight. Thus, although the defendant was on the Subject Flight at the time he received and made these calls, he was still able to communicate through the DEVICE via WiFi.

During the call, the defendant asked, in sum and substance, whether Individual-1 had been able to speak with Individual-4.  Individual-1 confirmed that she had been able to obtain the telephone number for Individual-4.[3]

Based on the investigation, it is apparent that the defendant provided his electronic devices, including the DEVICE, to Individual-1 prior to exiting the Subject Flight in order to prevent law enforcement authorities from seizing those devices, that Individual-1 exited separately from the defendant in order to distance herself from potential scrutiny by law enforcement, and that the defendant and Individual-1 continued to coordinate and use the concealed DEVICE while the defendant was incarcerated at the MDC.  These efforts by the defendant to prevent law enforcement officers from seizing and searching his electronic devices raise serious concerns that, if released, the defendant will continue to commit new crimes, namely continuing to obstruct justice and destroy evidence.

III.    The Defendant's Violation of his Conditions of Confinement and Continued Obstruction While at MDC

Indeed, the government's investigation has revealed that the defendant has no compunction with violating his conditions of <u>confinement</u> at the MDC, and thus surely cannot be trusted to comply with conditions of <u>release</u>.

MDC policy provides that each inmate has a secret and unique phone access code ("PAC") and must register all recipients of calls on an inmate call list.  MDC prohibits sharing or selling of PAC numbers, using another inmate's PAC number, or calling a recipient who is not on an inmate's approved list.  The government's ongoing investigation has revealed that since his arrest, the defendant has consistently violated the rules at the MDC by contacting Individual-1 on PAC codes held by other MDC inmates in order to avoid law enforcement scrutiny and to continue to engage in obstruction of justice.

Specifically, beginning on June 16, 2025, the defendant began having recorded telephone calls with Individual-1 using PAC codes held by multiple other inmates at the MDC and by calling a different phone number for Individual-1 ("PHONE-2").  The use of other inmates' PAC codes and calling an unregistered number for Individual-1 were both clear violations of MDC policy.  On these calls, the defendant and Individual-1 discussed the continued concealment of the defendant's devices, as well as efforts to conceal their conduct by the purchase and use of burner phones.

---

[3]        On or about July 2, 2025, law enforcement executed judicially authorized warrants to search Individual-1, her premises, and her vehicle.  During the search, law enforcement seized approximately 11 mobile devices.  A review of those devices is ongoing in order to determine whether any of the seized devices belongs to the defendant.  However, at this juncture it does not appear that any of the seized devices matches the description of the DEVICE known to belong to the defendant, likely reflecting that Individual-1 has disposed of or destroyed the DEVICE.

For example, on June 18, 2025, at approximately 8:11 p.m., Individual-1 engaged in another recorded telephone call with the defendant at the MDC. The defendant called Individual-1 at PHONE-2 utilizing another inmate's PAC code. During the call, Individual-1 told the defendant that, "when I left that night," she had met with another associate of Individual-1 and that "he took one of your, and I took one." She also stated "he didn't know I had the other one. He wanted all of your stuff." It appears that in these statements, Individual-1 was advising the defendant that, on the night of the defendant's arrest, she had provided one of the defendant's devices to an unidentified male associate and kept one of the defendant's devices in her own possession, although the unidentified male associate had wanted to take possession of all of the defendant's devices.

Similarly, on June 26, 2025, at approximately 6:20 p.m., Individual-1 engaged in a recorded telephone call with the defendant at the MDC. The defendant called Individual-1 at PHONE-2 utilizing another inmate's PAC code. During the call, Individual-1 and the defendant discussed Individual-1's purchase of multiple burner phones, including one for the defendant's "homeboy in Connecticut." The defendant directed Individual-1 to go to an electronics store, and to get a number "without you having to put any info in there. . . . I don't want the info in there. . . . Don't set it up with you."

On a subsequent call that evening at approximately 7:26 p.m.— made from yet another inmate's PAC code to PHONE-2—the defendant and Individual-1 had further discussions about Individual-1 obtaining a burner phone. During the conversation, the defendant directed Individual-1 to go to a store where Individual-1 could get a phone "on the Jane Doe side," an apparent reference to an anonymous purchase of a cellular telephone that could not be traced to Individual-1.

The investigation also indicates that the defendant is communicating with his co-defendant, Lori Zeno, in an apparent effort to obstruct the investigation. In particular, the government has received information that Zeno added an individual's name to the list of those permitted to enter the Penthouse Apartment ("Individual-5"). Thereafter, on or about June 29, 2025, Individual-1 showed up at the Penthouse Apartment while engaged in a recorded call with the defendant at the MDC via PHONE-2 and another inmate's PAC number. During the call, the defendant is placed on the phone with a doorman at the Penthouse Apartment and requests that Individual-1 be allowed to enter the Penthouse Apartment under the name of Individual-5. The staff member of the Penthouse Apartment refused to authorize the entry because Individual-1 was not Individual-5. Nevertheless, the exchange indicates that the defendant is communicating with Zeno (possibly through intermediaries) and is doing so in an apparent effort to gain access to those areas with potential evidentiary value to the investigation.

The government's investigation also has revealed that the defendant has been violating MDC policies about the possession and use of contraband mobile devices. For example, on June 15, 2025, at approximately 1:31 p.m., and on June 16, 2025, at approximately 6:53 p.m., Individual-1 engaged in recorded telephone calls with the defendant at the MDC via PHONE-1. During the calls, the defendant indicated that he had sent text messages to Individual-1. Specifically, on the June 16 call, the defendant stated, "I text you," and on the June 15 call, the defendant stated, "I text you that I don't know if you got my text man." Inmates at the MDC are not permitted to possess electronic devices capable of sending text messages in the

MDC and possession of such a contraband cellular telephone is a criminal offense and a violation of MDC rules.

Thus, the pattern of violating the terms of supervision reflected in the defendant's criminal history and his recent, repeated parole violations has continued while he has been incarcerated at the MDC, most alarmingly in efforts to obstruct justice and commit new federal felonies. If the defendant cannot comply with the law or MDC rules even while confined at the MDC, he certainly cannot be trusted to follow any conditions of pretrial release.

IV.     The Defendant's Fraud on the Organization is Far Larger than Previously Known

In addition to his criminal obstruction, lies to Pretrial, and pattern of failing to abide by conditions of release on his New York State probation and conditions of confinement at the MDC, the government's ongoing investigation indicates that the defendant's fraud on the Organization is far larger than previously known—at least approximately $300,000, leading to significantly higher potential sentencing exposure for the defendant and thus a greater incentive to flee.

Since the return of the indictment against the defendant, the government has continued its investigation and identified numerous additional suspicious transactions involving the Organization's corporate credit cards that were under the control of the defendant and his co-defendant. In addition, the government has been advised by the Organization that their estimate of the losses caused by the defendants is at least approximately $300,000. Based on the investigation, and losses of at least $300,000, the government estimates that the defendant's total offense level is a 27 under the United States Sentencing Guidelines ("the Guidelines"), resulting in a potential term of imprisonment of 78–97 months assuming the defendant is Criminal History Category II. Such a significant carceral sentence provides a powerful incentive for a defendant to flee.

V.    <u>Conclusion</u>

For the reasons set forth above and in Exhibits 1 and 2, the government respectfully submits that no condition or combination of conditions will properly assure the safety of the community or the defendant's return to court if he is released on bail, and therefore requests that the Court order that the defendant continue to be detained pending trial.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    <u>/s/ Russell Noble</u>
Russell Noble
Sean M. Sherman
Assistant U.S. Attorneys
(718) 254-6178/6262

cc:    Clerk of Court (by ECF)
Counsel of Record (by ECF)

# EXHIBIT 1



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

RCH:RWN/SMS                                  *271 Cadman Plaza East*
F. #2025R00028                               *Brooklyn, New York 11201*

June 11, 2025

<u>By Email</u>

The Honorable Vera M. Scanlon
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Rashad Ruhani
     <u>Criminal Docket No. 25-182 (RPK)</u>

Dear Judge Scanlon:

   On June 2, 2025, a grand jury sitting in the Eastern District of New York returned the above-captioned indictment charging the defendant Rashad Ruhani and co-defendant Lori Zeno with one count of wire fraud conspiracy in violation of 18 U.S.C. § 1349, three counts of wire fraud in violation of 18 U.S.C. § 1343, one count of theft concerning a program receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(A), and one count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h) (the "Indictment"). Ruhani was arrested last night by agents from the Federal Bureau of Investigation and is scheduled to make his initial appearance before Your Honor later today, and Zeno is expected to surrender for arraignment at a later date.

   The government respectfully submits this letter in support of its request for the pretrial detention of the defendant Rashad Ruhani, as there are no conditions of release that will reasonably assure his appearance in court and protect the community from further crimes.

I. <u>Background</u>

   From approximately 2018 to January 2025, Lori Zeno served as the executive director of a non-profit organization that provided legal services and community support services to indigent residents of Queens, New York (the "Organization"). While serving as executive director, Zeno hired the defendant Rashad Ruhani to work at the Organization and began a romantic relationship with him. In August 2024, Zeno and Ruhani were married in a religious

ceremony.[1]  Also in the summer of 2024, Zeno promoted Ruhani to a position managing the Organization's youth program and gave him a credit card tied to the Organization's bank account.

As described in the Indictment, from approximately June 2024 to January 2025, Zeno and Ruhani misappropriated tens of thousands of dollars of the Organization's funds to enrich themselves and others.  Zeno and Ruhani charged personal shopping and personal travel expenses to Organization credit cards and received reimbursements from the Organization for rent at a luxury penthouse apartment.  In addition, Zeno hired Ruhani's relatives and associates for low-show or no-show jobs.  Based in part on their misappropriation of the Organization's funds, Zeno was suspended by the Organization's board of directors and Ruhani was fired.

The government's investigation found that, for over six months, Zeno and Ruhani used the Organization's credit cards to fund their own lavish lifestyle.  For example, Zeno and Ruhani used the non-profit's credit cards to pay for thousands of dollars in purchases at luxury clothing stores, including Louis Vuitton, Bloomingdale's, Ralph Lauren, and Neiman Marcus.  Zeno and Ruhani also used Organization credit cards to pay for repairs to Ruhani's Mercedes Benz, teeth whitening procedures for themselves, and an 85-inch smart television.

Zeno and Ruhani also used the Organization's credit cards to pay for personal vacations, most notably their honeymoon trip to Bali.  Zeno redeemed thousands of dollars' worth of rewards points on an Organization credit card to buy airline tickets to Bali and lodging at a luxury hotel in Bali, in violation of Organization policy.  While in Bali, Zeno used an Organization credit card to pay for hotel expenses, food, and jewelry.  Similarly, in December 2024, Zeno used an Organization credit card to pay for expenses at a resort in Santa Monica, California, including food, alcohol, and use of a vehicle, along with DoorDash deliveries to the resort.

Besides their misuse of the Organization's credit cards, Zeno and Ruhani also submitted fraudulent requests to the Organization in order to obtain reimbursements for rent at a luxury apartment (the "Penthouse Apartment").  Zeno claimed that the purpose of the Penthouse Apartment was to provide housing for a homeless minor (hereinafter "M.G."), while concealing from the Organization that she and Ruhani were using the Penthouse Apartment for themselves as well.  For instance, Zeno's Organization credit cards were used to pay for an 85-inch smart television to be shipped to and installed at the Penthouse Apartment and regular DoorDash deliveries to the Penthouse Apartment; Zeno and Ruhani also repeatedly used Organization credit cards to pay for parking there, which they sometimes improperly reported as a business expense.

Between August and October 2024, Ruhani requested and received over $39,000 in reimbursements from the Organization for rent at the Penthouse Apartment, despite the fact that it was Zeno, and not Ruhani, who was paying the rent.  Ruhani not only misrepresented who was paying for the Penthouse Apartment; he actively concealed Zeno's involvement from the

---

[1]     The government does not believe this marriage is legally recognized and understands that both Zeno and Ruhani were married to other individuals.

Organization.  In support of his reimbursement requests, Ruhani submitted pages of a lease agreement that were altered to hide the fact that Zeno was also a registered occupant of the Penthouse Apartment, as shown below:[2]

### GENUINE LEASE AGREEMENT EXCERPT:

> **B.** The Apartment may only be occupied by (i) Tenant and his or her immediate family, and (ii) any person otherwise permitted to occupy the Apartment pursuant to New York Real Property Law §235-f (the person[s] set forth in [ii] being referred to hereinafter as "Registered Occupant" or "Registered Occupants"). Tenant warrants and represents that no persons other than the following Registered Occupants shall occupy the Apartment:
>
> 1) <u>Lori Zeno</u>
> 2) <u>M     G</u> (Occupant)
> 3) <u>Rashad Ruhani (Occupant)</u>

### VERSION OF LEASE EXCERPT SUBMITTED TO THE ORGANIZATION:

> **B.** The Apartment may only be occupied by (i) Tenant and his or her immediate family, and (ii) any person otherwise permitted to occupy the Apartment pursuant to New York Real Property Law §235-f (the person[s] set forth in [ii] being referred to hereinafter as "Registered Occupant" or "Registered Occupants"). Tenant warrants and represents that no persons other than the following Registered Occupants shall occupy the Apartment:
>
> <u>M     G</u> (Occupant)
> <u>Rashad Ruhani (Occupant)</u>

Ruhani also submitted versions of the monthly rent statements that were altered to replace Zeno's name with his own, further concealing Zeno's involvement with the Penthouse Apartment, as shown below:

### GENUINE MONTHLY STATEMENT:



Astoria, NY 11102

Account Number: 49501-1-PH1-3
Invoice Number: 000000569410
Amount Due: 5,955.24
Date Due: 8/1/2024

Lori Zeno
10 Halletts Point, PH1
Astoria, NY  11102

| Date | Code | Description | Billed Amount | Paid | Amount Due |
|------|------|-------------|--------------|------|-----------|
| 7/20/2024 | 605 | Lockout Fees | 50.00 | 0.00 | 50.00 |
| 7/25/2024 | 607 | CHW 2378 kWh 070324-071224 | 71.92 | 0.00 | 71.92 |
| 7/25/2024 | 612 | Elec 50 kWh 070324-071224 | 24.23 | 0.00 | 24.23 |
| 7/25/2024 | 613 | Electric Service Sales Tax | 1.09 | 0.00 | 1.09 |
| 8/1/2024 | 101 | Rent Income Residential | 6,208.55 | 400.55 | 5,808.00 |

Please visit 'www.clickpay.com/royal' to pay online. For further information or inquiries regarding your utility usage please visit 'www.emsys1.com' to access your account.

---

[2]    The full name of M.G. and address of the Penthouse Apartment have been redacted from the below excerpts.

## VERSION OF MONTHLY STATEMENT SUBMITTED TO THE ORGANIZATION:


Astoria, NY 11102

Account Number: 49501-1-PH1-3
Invoice Number: 000000569410
Amount Due: 5,955.24
Date Due: 8/1/2024

Rashad Ruhani
10 Halletts Point, PH1
Astoria, NY  11102

| Date | Code | Description | Billed Amount | Paid | Amount Due |
|------|------|-------------|--------------:|-----:|-----------:|
| 7/20/2024 | 605 | Lockout Fees | 50.00 | 0.00 | 50.00 |
| 7/25/2024 | 607 | CHW 2378 kWh 070324-071224 | 71.92 | 0.00 | 71.92 |
| 7/25/2024 | 612 | Elec 50 kWh 070324-071224 | 24.23 | 0.00 | 24.23 |
| 7/25/2024 | 613 | Electric Service Sales Tax | 1.09 | 0.00 | 1.09 |
| 8/1/2024 | 101 | Rent Income Residential | 6,208.55 | 400.55 | 5,808.00 |

Please visit 'www.clickpay.com/roysf' to pay online. For further information or inquiries regarding your utility usage please visit 'www.emsys1.com' to access your account.

  In at least one instance, Ruhani requested reimbursement from the Organization for rent that had not yet been paid, deposited the check issued by the Organization, then funneled the money from the Organization to Zeno, who paid that month's rent at the Penthouse Apartment.  As with the altered lease documents, this circuitous flow of money served to conceal Zeno's role in paying for the Penthouse Apartment.

  The investigation also found that Zeno secured lucrative positions at the Organization for relatives and associates of Ruhani who did little or no substantive work.  In August 2024, Zeno hired two individuals ("Employee-1," who is listed as Ruhani's daughter in his employee file, and "Employee-2")—as her executive assistants, with respective salaries of approximately $80,000 and $65,000.  Employee-1 and Employee-2 were ostensibly hired to assist Zeno with submitting expense reports—many of which falsely claimed personal expenses as legitimate business expenses—and each clocked into work only a single time during their entire period of employment.

  Similarly, in November 2024, Zeno hired a woman Ruhani had married in or around 2015[3] ("Employee-3") as the director of a non-existent "health and wellness" program with a salary of approximately $60,000.  Not only did Employee-3 perform no substantive work for the Organization; the investigation indicates that for her entire period of "employment," she was not even present in the United States.

  During a search of the Penthouse Apartment, agents found several items purchased with the Organization's credit cards, including clothing, furniture, and the aforementioned television, along with over 10 credit cards in Ruhani's name.

---

[3]  The government is not aware of the current status of their relationship.

Ultimately, through their misuse of the Organization's credit cards, fraudulent reimbursement requests, and low-show or no-show jobs, Zeno and Ruhani together embezzled or misapplied tens of thousands of dollars that were meant to fund legal services for indigent residents of Queens County.

## II.    Legal Standard

The court "shall order" a defendant detained if it finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The government bears the burden of persuading the court by a preponderance of the evidence that the defendant is a flight risk or that he will obstruct or attempt to obstruct justice, or by clear and convincing evidence that the defendant is a danger to the community. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). The government may proceed by proffer to establish facts relevant to a detention determination. United States v. Ferranti, 66 F.3d 540, 541 (2d Cir. 1995). Furthermore, "[t]he rules of evidence do not apply in a detention hearing." Id. at 542. As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers. This is because bail hearings are typically informal affairs, not substitutes for trial or discovery. Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004) (internal citations and quotation marks omitted).

The Bail Reform Act lists four factors to be considered in the detention or bond analysis: (1) the nature and circumstances of the crimes; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including "the person's character"; and (4) the nature and seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g). In evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

## III.    Ruhani Should Be Detained Pending Trial

Based on the serious nature of the offenses, the strength of the evidence, and his ability and incentives to flee, the government respectfully submits that no bail package will adequately ensure Ruhani's return to court and protect the community from continued criminal activity by Ruhani.

The nature and circumstances of the crimes are serious and flagrant. Ruhani and Zeno took money meant for legal representation of the most disadvantaged in their community and spent it on expensive items and trips for themselves, exploiting Zeno's status as both a

licensed attorney and the head of a legal services organization. If Ruhani is convicted at trial, he faces a sentence of up to 20 years' imprisonment. See 18 U.S.C. § 1343. A conservative estimate of the defendant's potential sentencing Guidelines yields an estimated Guidelines range of 41-51 months' imprisonment, though the government notes that its investigation is ongoing.

Moreover, the evidence of Ruhani's guilt is strong. It consists of voluminous documentary evidence, emails, financial records, cell site location data, and the criminal proceeds found at the Penthouse Apartment. Where the weight of the evidence is strong, "it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight." United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022); United States v. Sabhnani, 493 F.3d 63, 76 (2d Cir. 2007) (finding detention appropriate because, in part, "the evidence of [the defendants'] guilt, both direct and circumstantial, appears strong"); United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long a defendant has stronger motives to flee."). Ruhani's risk of flight is further elevated by his prior foreign travel to Bali, Indonesia and his apparent foreign ties; it is the government's understanding that his wife, Employee-3, is based in Saudi Arabia.

Ruhani has a serious criminal history that weighs heavily in favor of detention. Ruhani has three violent felony convictions—for attempted criminal possession of a weapon, attempted robbery with a dangerous instrument, and robbery with an apparent firearm—all under different aliases and all committed while he was already on probation for prior convictions. For the most recent of these, a 1996 conviction for robbery with what appeared to be a firearm, Ruhani was sentenced as a persistent violent felon to imprisonment for 25 years to life. Ruhani was released from prison in July 2022 and is currently under lifetime parole supervision—which, nonetheless, did not deter him from committing the instant crime and embezzling tens of thousands of dollars from the Organization. In addition, Ruhani's criminal history shows a pattern of failing to appear in court; in one case, three separate bench warrants were issued before he was ultimately convicted of felony possession of narcotics. In light of his serious criminal record and history of failing to appear for court and violating probation, pretrial detention is necessary to ensure his return to court and to ensure he commits no further crimes during the pendency of these proceedings.

IV.    Conclusion

For the reasons set forth above, the government respectfully submits that no condition or combination of conditions will properly assure the safety of the community or

Ruhani's return to court if he is released on bail, and therefore requests that the Court order that Ruhani be detained pending trial.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    /s/ Russell Noble
Russell Noble
Sean Sherman
Assistant U.S. Attorneys
(718) 254-6178/6262

cc:    Clerk of Court (VMS) (By Email)
Counsel of Record (By Email)

# EXHIBIT 2



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

RCH:RWN/SMS                                      *271 Cadman Plaza East*
F. #2025R00028                                   *Brooklyn, New York 11201*

June 25, 2025

<u>By ECF</u>

The Honorable Cheryl L. Pollak
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Rashad Ruhani
               <u>Criminal Docket No. 25-182 (RPK)</u>

Dear Judge Pollak:

        The government respectfully submits this letter to supplement its initial detention memorandum, attached hereto as Exhibit 1, and to set forth additional facts in support of the defendant's continued pre-trial detention.

        The defendant is charged by indictment in the above-referenced case with one count of wire fraud conspiracy in violation of 18 U.S.C. § 1349, three counts of wire fraud in violation of 18 U.S.C. § 1343, one count of theft concerning a program receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(A), and one count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h) (the "Indictment"). See ECF No. 1. Generally speaking, the defendant and his co-defendant conspired to defraud the non-profit organization at which they worked (the "Organization") of tens of thousands of dollars. See id.

        The defendant was arrested on the evening of June 10, 2025, and an arraignment was held the following day before the Honorable Vera M. Scanlon, United States Magistrate Judge. Given his serious criminal history, including a sentence of imprisonment for 25 years to life for his third violent felony conviction; his repeated violations of probation and failures to appear in court; and the fact that his wife is based in Saudi Arabia, the government sought detention. See Exhibit 1 at 5-6. Defense counsel did not propose a bail package at the time and consented to detention until he could present a bail application. Judge Scanlon found that the defendant was a danger to the community and entered an order of detention. See ECF No. 7.

I.        The Defendant's Repeated Parole Violations

The defendant is currently on lifetime parole following his third violent felony conviction in New York, for which he was sentenced as a persistent violent felony offender to imprisonment for 25 years to life.  Since his release from prison in July 2022, he has been under parole supervision in New York State.  The government has conferred with the officers of the New York State Department of Corrections and Community Supervision, who are responsible for the defendant's supervision.  Besides the commission of the instant offense, the defendant has also consistently violated the conditions of his New York State parole, including by residing at an unapproved address and repeatedly leaving the state without permission.

One condition of the defendant's New York State parole is that he reside at the address approved by his parole officer.  During his entire period of release, the defendant's only approved residence has been his parent's home in Corona, New York.  However, beginning in July 2024, the defendant resided at a luxury penthouse apartment in Astoria, Queens (referred to in the Indictment and Exhibit 1 as the "Penthouse Apartment"), which was paid for by the Organization based on fraudulent reimbursement requests.  For the next several months, the defendant lied to his parole officers, claiming that he was still residing at his parents' house while at the same time providing the Penthouse Apartment as his home address to the various vendors where he spent the Organization's money.  When New York State parole officers visited the defendant's parents' address in July, August, and October, the defendant was not there.  In October, his parole officer told him that it was apparent that he was residing at another address and instructed him to provide his current address.  The defendant lied again, insisting that he was residing at the approved residence and promising to continue to live with his mother.  Nonetheless, when his parole officer visited his approved residence the following day, the defendant was not there.

In fact, the defendant did not notify his New York State parole officers of his intent to reside in the Penthouse Apartment until February 2025, after he had already been living there for over six months.  The defendant's parole officer did not authorize him to move to the Penthouse Apartment.  Thus, the Penthouse Apartment, where he told Pretrial Services in the instant matter before this Court that he was living and would return to if released on bond, is an address that has never been approved by parole, where he nonetheless has lived in violation of his New York State parole conditions since July 2024.

Another condition of the defendant's New York State parole is that he may not leave the state of New York without prior permission from his parole officer.  The defendant sought and received permission from parole to travel to Bali, Indonesia in September 2024.  He did not receive permission to travel out of New York State any other time since his release in 2022.

The government is aware of several instances when the defendant traveled out of state without receiving permission from his parole officer, or even notifying parole at all.  In October 2024, he traveled to Atlanta, Georgia, where he charged over $1,100 to an Organization credit card to buy a pair of loafers from Neiman Marcus and over $5,000 to buy suits from Suitsupply.  In November 2024, he traveled to New Jersey, where he spent over $2,600 at a steakhouse.  In December 2024, he traveled to a luxury resort in Santa Monica, California with

his co-defendant, who used an Organization credit card to pay for expenses. Besides these trips, the government is aware of at least a dozen other instances in which the defendant traveled out of New York State without informing his parole officer, including trips to New Jersey, Connecticut, Massachusetts, and Washington, D.C. He also told Pretrial Services in the instant matter that he traveled to the Dominican Republic and Turks and Caicos in 2024. Then, in June 2025, he flew to California, and he was arrested at J.F.K. airport upon his return to New York. He did not seek or receive permission from parole for any of these out-of-state trips, and each one was in violation of the conditions of his New York State parole.

Thus, since his release from prison in 2022, the defendant has repeatedly disregarded the conditions of his New York State parole, continuing the pattern of violating conditions of release reflected in his criminal history. There is every reason to believe that the defendant will not comply with the conditions of pre-trial release in the instant matter as well.

## II.    The Defendant's Efforts to Obstruct the Investigation

The defendant also cannot be trusted to comply with any conditions of release because he has already taken steps to obstruct the investigation of this case by discarding his cell phones before they could be seized, after he was contacted by another subject. Specifically, on June 10, 2025, the defendant boarded a flight from Los Angeles to New York. Law enforcement officers conducting surveillance of the defendant observed the defendant holding his cell phone in his hand prior to boarding the flight. While the defendant was en route to New York, he received a phone call on his cell phone from a phone number associated with a subject of this investigation whose cell phone had been seized by federal investigators earlier that day pursuant to a search warrant. Once the defendant's flight landed at J.F.K. Airport, location information obtained pursuant to a judicially authorized search warrant showed that his cell phone was on and located in the vicinity of J.F.K. airport. The defendant's phone then ceased connecting to cellular towers, indicating that it had been powered off.

The defendant then exited from the plane and was placed under arrest by federal law enforcement agents. However, the defendant no longer had his cell phone or any other electronic device in his possession, though he did have two iPhone chargers.

Under these circumstances, it is apparent that the defendant was tipped off to the law enforcement investigation and discarded his cell phones after his flight landed and before his arrest. This conduct raises serious concerns that, if released, the defendant will continue to commit new crimes, namely attempting to obstruct justice and destroy evidence.

## III.    False Statements to Pretrial Services and Undisclosed Assets

In addition, the defendant made numerous half-truths and false statements to Pretrial Services, which may reflect access to concealed assets, raising a concern that the defendant may have the means to flee. For example, while the defendant told Pretrial Services that he resides at the Penthouse Apartment, he did not disclose that the Penthouse Apartment is leased by his co-defendant and was funded for a period of time by the Organization as noted above. In addition, while the defendant told Pretrial Services that he owns a 2020 Mercedes, the government is also aware that the defendant hid from Pretrial Services his ownership of a BMW

3

as well.  And while the defendant claims to be employed by a company (the "Company") for the past two years earning $90,000 annually—a period of time that overlaps with the period he was purportedly a Director at the Organization earning approximately $160,000—he failed to disclose to Pretrial Services that the Company is controlled by his wife (who is referred to as Employee-3 in Exhibit 1), who as the government previously explained, lives in Saudi Arabia.

IV.    Conclusion

For the reasons set forth above and in Exhibit 1, the government respectfully submits that no condition or combination of conditions will properly assure the safety of the community or Ruhani's return to court if he is released on bail, and therefore requests that the Court order that Ruhani continue to be detained pending trial.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    /s/ Russell Noble
Russell Noble
Sean M. Sherman
Assistant U.S. Attorneys
(718) 254-6178/6262

cc:    Clerk of Court (by ECF)
Counsel of Record (by ECF)

4